Filed 8/25/21  In re F.G. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re F.G. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>P.M.,<br><br>    Defendant and Appellant. | G060143<br><br>(Super. Ct. Nos. 18DP1250, 18DP1251, 18DP1252 & 18DP1253)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

**INTRODUCTION**

P.M. (mother) is the mother of four children who were declared dependents of the juvenile court:  F.G. (now 15 years of age), S.G. (13), A.G. (12), and D.G. (4).[1]

After reunification services were terminated and the matter was set for a permanency hearing under Welfare and Institutions Code section 366.26 (all further statutory references are to the Welfare and Institutions Code), mother filed a section 388 petition.  Mother's petition asked that D.G. be returned to mother's care and custody, or that the section 366.26 hearing as to D.G. be continued.  The juvenile court found that mother had made a prima facie showing and scheduled an evidentiary hearing on the section 388 petition.  After that hearing, the juvenile court denied the petition.

On appeal, mother contends that the children's counsel had a conflict of interest because she could not independently evaluate D.G.'s best interests while continuing to represent F.G., S.G., and A.G., whose statements to the social worker formed a portion of the Orange County Social Services Agency's (SSA) recommendation against mother's section 388 petition.

We affirm.  There was no actual conflict of interest in the children's counsel's continued representation of all four minor children, even after mother sought to regain custody of the youngest child.  Even if we were to find there was a conflict of interest, any error in allowing counsel to continue representing all four children was harmless because there was no reasonable probability that the juvenile court would have granted the section 388 petition even if new counsel had been appointed for D.G.

---

[1]  Where appropriate, for ease of reading, we will refer to the four children collectively as "the children."  Fr.G. is the father of F.G., S.G., and A.G.  J.Q. is the father of D.G.  Neither of the fathers is a party to this appeal.

2

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.

### DETENTION, JURISDICTION, AND DISPOSITION

In November 2018, mother and her four children were homeless and staying at the home of a friend in Orange County. While they were preparing to leave the home, A.G., then nine years of age, accidentally locked the car keys inside mother's vehicle. Mother became upset and struck A.G. several times with a shoe or sandal and slapped and punched her. Mother reported she was "too mad" to recall what had happened. A.G. had scratches and abrasions on the side of her neck and face, and her face was swollen. Mother was arrested for child abuse, and SSA took the children into protective custody. F.G. reported that mother "hit us all equally." The friend with whom the family was staying had "observe[d] several incidents where the mother became angry at the children and screamed at them for no reason."

SSA filed a petition alleging that the children came within the juvenile court's jurisdiction pursuant to section 300, subdivisions (b)(1), (g), and (j).[2] The Law Offices of Harold LaFlamme were appointed by the juvenile court to represent all four children. SSA placed the children with a maternal great-aunt (the caregiver). The caregiver reported that the children adapted well to living in her home, maintaining a schedule, and doing chores.

The juvenile court sustained the petition as amended, removed the children from mother's custody, and ordered reunification services for mother.

---

[2] The petition originally alleged A.G. was subject to section 300, subdivision (a); at the jurisdiction hearing, the juvenile court struck that allegation on SSA's motion.

3

## II.

### POSTDISPOSITION, MOTHER RECEIVES REUNIFICATION SERVICES AND HAS VISITATION WITH THE CHILDREN

While mother's visitation with the children between March and November 2019 was "minimal," after she changed her work schedule and received a bus pass she began attending weekly supervised visits. F.G., S.G., and A.G. initially wanted to return home, although they enjoyed living with the caregiver and felt safe and loved in her home. A.G. reported that mother told her to fabricate allegations of physical abuse against the caregiver. Mother and the caregiver did not get along.

The children continued to thrive in the caregiver's care and exhibited no behavioral concerns. The caregiver expressed her willingness to provide a permanent placement for the children.

In April 2020, mother had another baby with a new boyfriend.[3] SSA did not file a dependency petition for this child, but instead offered mother voluntary services through the Priority Center.

Due to the COVID-19 pandemic, visits between mother and the children were conducted by video phone calls from March through June 2020. Both the caregiver and the children reported that the calls were infrequent and short. S.G. believed that mother only called because she had to, and the children did not believe mother cared about them or had time for them. The children wanted to remain in the caregiver's care and did not want to reunify with mother.

When in-person visitation resumed, mother spent a lot of time on the phone during the visits and showed favoritism to F.G. Although mother left visits early to pick up her boyfriend from work and on one occasion left D.G. in the caregiver's care, the children appeared to enjoy themselves and reported that visits were improving and

_____

[3] This child is not involved in the present dependency proceeding.

4

mother was talking to them more. Mother requested that someone other than the caregiver supervise the visits. After in-person visits resumed, mother stopped calling the children, and her only communication with them was during the single weekly in-person visit.

In August 2020, SSA authorized additional unsupervised visitation at a local park on Sundays. At the first unsupervised visit, mother violated the established rules in at least the following ways: allowing her boyfriend and his family to attend the visit; failing to follow social distancing and mask wearing protocols; driving the children to a different location although she did not have a driver's license; returning the children three hours after the scheduled end of the visit; and lying to the caregiver. When confronted during a telephone conversation with these violations, mother became defensive, yelled at the social worker, and abruptly hung up. SSA urged mother to work on her relationship with the children before bringing her boyfriend to their visits. Mother was "adamant" that she could not attend Sunday visits without her boyfriend.

In September 2020, SSA again authorized unsupervised visits. Despite the children stating they did not want mother's boyfriend at the visits, he showed up at the very first one that mother attended. Although mother told the caregiver her boyfriend was only dropping her off and picking her up, the children reported that he was there for the entire visit. A.G. told the social worker that during visits, mother would bring up the court case and demand that the children say who they wanted to live with, and threatened to only fight to regain custody of D.G.

At the contested 18-month hearing, the juvenile court found that mother had made only moderate progress, and therefore terminated reunification services and scheduled a section 366.26 hearing. All parties agreed that the recommended permanent plan would be legal guardianship.

The caregiver expressed a commitment to provide the children with a permanent home as their legal guardian. The children felt comfortable in the caregiver's home. According to the social worker's report, "[t]he [prospective] legal guardian has also integrated the children into her own family unit [and] provides consistent love and attention. The children trust the [prospective] legal guardian and feel safe sharing the issues or concerns they have with her."

Mother continued visiting with the children. During some of the visits, mother and the children participated in telephonic family therapy. The visits generally went well and mother acted appropriately.

The three older children, however, expressed concern about mother's behavior generally, and specifically at the park visits. The children claimed they were supervising D.G. during visits, not mother. D.G. fell into a lake at the park on two occasions when mother was not paying attention to her. On another occasion, D.G. got lost after leaving the restroom without S.G., and was later found with another group of people in the park. The children also reported that mother's boyfriend made them feel uncomfortable when he attended visits, and would scream and curse at mother when he called her via the Bluetooth speaker in her car. The children also claimed mother told them the caregiver only wanted them for the money, and blamed the children for her lack of progress in the case. A.G. told the caregiver that mother hurt her feelings by saying she smelled like "rotten sausage."

F.G., S.G., and A.G. were "indifferent" about returning to mother's care. D.G. was too young to express an opinion. A new child welfare investigation was initiated after F.G. and A.G. reported that, during a February 2021 visit, mother's boyfriend refused to sit at a separate table and "began pulling the mother's arms and biting her fingers." A.G. claimed mother blamed her for the new investigation and

looked at her in an "awful way." A.G. then refused to participate in further visits with mother.

The children's therapist reported that the children wanted to remain with the caregiver because they did not trust that mother could prevent future homelessness.

III.

THE SECTION 388 PETITION

On the day of the section 366.26 hearing, mother filed a section 388 petition asking the juvenile court to return D.G. to her care or, in the alternative, to liberalize visitation with D.G. and continue the section 366.26 hearing for D.G. Mother's declaration stated: she was currently in counseling; she was receiving voluntary services through the Priority Center for her youngest child (born during the dependency proceedings but not involved in them); her youngest child was sleeping though the night and starting to walk, making it easier to care for that child and D.G.; she was living in a two-bedroom apartment where D.G. would have her own room; she accepted the decision of F.G., S.G., and A.G. to stay with the caregiver; she would be better able to care for just D.G. and her youngest child than all five children; D.G. called her "Mommy" and often said "I love you," "I miss you," and "Can I go with you?"; D.G. had taken on the role of an older sister to mother's youngest child; D.G. was "missing out on learning milestones and developmental stages with her mother"; mother had a stable and productive lifestyle, had her youngest child in her custody, had stable housing, and was committed to continuing in services; she had completed or was actively participating in the components of her case plan; and she had a strong bond with D.G.

The juvenile court found mother had made a prima facie case, and ordered an evidentiary hearing on the petition.

7

IV.

THE EVIDENTIARY HEARING; THE JUVENILE COURT DENIES THE SECTION 388 PETITION
AND ORDERS LEGAL GUARDIANSHIP AS THE CHILDREN'S PERMANENT PLAN

The children's counsel continued to represent all four children at the evidentiary hearing; no party raised an objection. At the evidentiary hearing on mother's section 388 petition, the court considered testimony from mother and the social worker, and admitted SSA's most recent reports. The parties stipulated that mother had given birth to a sixth child the previous day.[4]

The social worker testified she would have concerns regarding D.G.'s safety if she were returned to mother's care. These concerns were exacerbated by D.G.'s inability to articulate safety concerns due to her age, mother's lack of supervision of D.G., mother's failure to follow rules, and her failure to take care of the children's emotional well-being. While the social worker agreed that caring for two children was generally easier than caring for five children, she noted that caring for two children under age four could be harder than caring for three preteen children. The family's therapist had told the social worker "that during therapy, there isn't much discussion of concerns, or issues that come up." The social worker opined that mother's failure to supervise the children and her lack of concern for their emotional well-being showed that mother had not improved in her parenting.

The social worker also testified that D.G.'s needs were being met in her placement with the caregiver. All four children were "bonded," and the three older children "care for each other," "help with D[.G.]," and "are concerned with the lack of supervision by mother with D[.G.]."

Mother testified that D.G. called her "Mommy," told her "I love you," and asked if she could go home with mother. Mother testified she could obtain child care for

---

[4] This child is not a part of the current dependency proceeding.

8

D.G. through the Priority Center and it would be easier for her to supervise just D.G. than all four children (although mother did not address also raising the two babies who were not part of the current dependency proceeding). Mother believed D.G. would be "a little bit sad" if she were not living with her older siblings, but that she would eventually be fine. Mother was committed to facilitating sibling visitation.

Mother claimed the reports of D.G. getting lost and falling in a lake were exaggerated. Mother also admitted she should not have allowed her boyfriend to be present at visits with the children, but that he had only been present to drop off a phone charger and to bring Chinese food. Mother admitted her boyfriend had cursed when speaking to her by telephone via Bluetooth, but said he was not angry at the time. Mother also denied fighting with her boyfriend, speaking poorly about the caregiver, telling A.G. she smelled, or blaming the children for her own lack of progress in complying with her case plan.

Mother's counsel argued that mother was prepared to resume caring for D.G., and that the concerns expressed by the older children were exaggerated.

Mother's counsel also argued that there had been a change of circumstances in mother's parenting skills and her insight into the case. Further, counsel argued that the return of D.G. to mother's care and custody would be in D.G.'s best interests "so that D[.G.] can grow up with her biological mother, who is a safe and stable parent, so she could grow up with [her younger half-brother] who . . . she is close in age with, and still have a robust and flourishing relationship with her older siblings."

Both SSA's counsel and the children's counsel opposed the section 388 petition on the ground mother had failed to show either changed circumstances or that the proposed order would be in D.G.'s best interests.

During one part of the argument, the children's counsel discussed a children's family team meeting that occurred in December 2020 to address mother's lack

9

of supervision during visits.  The children's counsel noted that at this meeting, mother minimized the issues, saying both that the social worker "makes a big issue out of everything," and that the children had exaggerated what had happened.  The children's counsel then noted that, "at this meeting, the children still maintained their truth about the situation."

The juvenile court denied the section 388 petition on the ground mother had failed to demonstrate a sufficient change in circumstances and had failed to show that the proposed modification would promote D.G.'s best interests.

The juvenile court then proceeded with the section 366.26 hearing, at which mother's counsel submitted on the recommendation to order legal guardianship.  The court ordered legal guardianship as the permanent plan, and appointed the caregiver as the children's legal guardian.

**DISCUSSION**

I.

THE JUVENILE COURT DID NOT ERR BY FAILING TO APPOINT INDEPENDENT COUNSEL FOR D.G. AT THE HEARING ON THE SECTION 388 PETITION[5]

Separate counsel must be appointed for different siblings in a dependency matter only when an actual conflict arises.  "When first appointing counsel in a

---

[5]  SSA contends that the issue of whether independent counsel should have been appointed for D.G. has been forfeited because it was not raised in the juvenile court.  In a criminal case, the issue of an attorney conflict of interest may be raised for the first time on appeal "so long as the trial court knew, or reasonably should have known, of the possibility of a conflict of interest."  (*People v. Bonin* (1989) 47 Cal.3d 808, 839.)  *In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 563-564, held that the same rule applies in dependency cases.  That court also held that a parent may assert his or her child's right to independent counsel:  "A father has standing to assert his child's right to independent counsel, because independent representation of the children's interests impacts upon the father's interest in the parent-child relationship."  (*Id.* at p. 565.)

10

dependency matter, the court may generally appoint a single attorney to represent all the siblings. It would have to appoint separate attorneys if, but only if, there is an actual conflict among the siblings or if circumstances specific to the case—not just the potential for conflict that inheres in all multisibling dependency cases—present a reasonable likelihood an actual conflict will arise. If these specific circumstances exist, the court should appoint separate counsel at the outset rather than await an actual conflict and the possible disruption a later reappointment may cause. After the initial appointment, the court will have to relieve counsel from multiple representation if, but only if, an actual conflict arises." (*In re Celine R.* (2003) 31 Cal.4th 45, 58.)

In the present case, there is no contention that an actual conflict or a reasonable likelihood of an actual conflict existed at the time the dependency proceedings were initiated. Therefore, separate counsel would only be necessary at the hearing on the section 388 petition if an actual conflict had arisen at that time.

To establish an "actual conflict" in a dependency matter, a specific showing is required: "For an actual conflict to arise at the permanency planning stage, there must be a showing that the siblings have different interests that would require their attorney to advocate a course of action for one child which has adverse consequences to the other. Standing alone, the fact that siblings have different permanent plans does not necessarily demonstrate an actual conflict of interest." (*In re T.C.* (2010) 191 Cal.App.4th 1387, 1391; see *In re Barbara R.* (2006) 137 Cal.App.4th 941, 953-954.) Thus, at the section 388 hearing, the potential that D.G.'s permanent plan might be changed and therefore be different than the permanent plans for F.G., S.G., and A.G. did not create an actual conflict for the children's counsel.

The issue before the juvenile court at the evidentiary hearing on mother's section 388 petition was two-fold: Whether mother had established changed (not changing) circumstances since the time reunification services had been terminated and

11

the permanency planning hearing had been set, and whether either returning D.G. to mother's care or continuing her permanency hearing would be in D.G.'s best interests. Mother fails to show that the children's counsel had an actual conflict of interest. Nothing establishes the children's counsel was required to advocate a course of action for D.G. that would have adverse consequences for F.G., S.G., and A.G.  The same conclusion is warranted even assuming the children's counsel agreed that pursuing reunification between mother and D.G. was in D.G.'s best interest.

## II.

### ANY ERROR WAS HARMLESS

Even if an actual conflict of interest had existed, and the juvenile court should have appointed separate counsel for D.G., reversal is only appropriate if we find a reasonable probability that the outcome would have been different if separate counsel had been appointed.  (*In re Celine R., supra*, 31 Cal.4th at p. 60 ["A court should set aside a judgment due to error in not appointing separate counsel for a child . . . only if it finds a reasonable probability the outcome would have been different but for the error"]; *In re Elizabeth M., supra*, 232 Cal.App.3d at p. 568 ["error in failing to appoint independent counsel for children with varying interests" only requires reversal if there has been a miscarriage of justice]; see *In re Richard E.* (1978) 21 Cal.3d 349, 355.)

Mother contends that "it is reasonably probable that independent counsel for D[.G.] could have convinced the juvenile court to grant the section 388 petition. Independent counsel willing to scrutinize the statements of F[.G.], S.G., and A[.G.] may very well have agreed with mother's assessment that many of their statements were exaggerated.  [Citation.]  Independent counsel may have also prioritized D[.G.]'s bond with mother, for which there was no contrary evidence.  [Citation.]  Knowing that a trained legal professional with access to confidential information agreed with the

12

modification request following an independent assessment of D[.G.]'s best interests could have tilted the 'emotional balance' in favor of granting the petition. The error in failing to appoint independent counsel for D[.G.] was therefore prejudicial."

At the section 388 hearing, SSA opposed mother's requests because mother had failed to show she could adequately supervise D.G., mother was not honest and did not comply with SSA's requirements, D.G. was not old enough to be able to verbalize any problems with mother's supervision, and mother had not resolved problems with her lack of emotional support for the children. Mother did not dispute that any of the issues regarding her lack of supervision of the children (especially D.G.) had occurred. Rather, she claimed the children were exaggerating and the situation was not as serious as reported by the children and SSA. The juvenile court read SSA's reports and heard mother's testimony on these matters. The children's counsel did not witness any of the incidents; if independent counsel had been appointed for D.G., the most they could do would be to independently evaluate the recorded statements of the children and of mother and base a recommendation on that evaluation to the court. That, however, is exactly what the juvenile court had already done, and there is no reason to believe that another counsel's interpretation of those statements would in any way have changed the juvenile court's ruling.

Further, mother's entire argument assumes that independent counsel for D.G. would have agreed with mother rather than SSA and the children's counsel regarding the benefit to D.G. of being returned to mother's care. Nothing in the appellate record supports that assumption. The only evidence of benefit to D.G. was mother's declaration in support of the section 388 petition. There was no evidence that D.G. would suffer detriment if her relationship with mother were severed. (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.) The existence of affectionate and positive interactions between a child and parent, without evidence of a significant, positive

13

emotional attachment is insufficient to demonstrate harm sufficient to constitute prejudicial error.

## DISPOSITION

The order is affirmed.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14